IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

MARCO J. HERNANDEZ,

 Plaintiff,

vs.

J.P. MORGAN CHASE BANK N.A.,
A Delaware Corporation,

and

BAYVIEW LOAN SERVICING LLC,
A Delaware Limited Liability Company,

 Defendants.
 _____/

## COMPLAINT FOR DAMAGES

 Plaintiff Marco Hernandez, by and through undersigned counsel, sues Defendant J.P. Morgan Chase Bank, N.A., and alleges:

### I.  THE PARTIES, JURISDICTION, AND VENUE

 1. Plaintiff Marco Hernandez is a natural person, a citizen of Miami-Dade County, Florida, over the age of 21 and otherwise sui juris.

 2. Defendant J.P Morgan Chase Bank N.A. is a Delaware Corporation with its principal place of business in the State of New York. This Defendant will be referred to hereafter as "Chase."  Among other business activities, Chase is engaged in the business of servicing federally related residential mortgages.  As a mortgage servicer, Chase is responsible for the day-to-day management and administration of mortgage loans on behalf of mortgage investors who

participate in the secondary mortgage market.  Chase is subject to specific federal laws and administrative regulations governing its mortgage serving activities. These laws include, but are not limited to, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et. seq*. (hereinafter RESPA) and implementing Regulation X, (12 C.F.R  part 1024), hereinafter "Regulation X" , as well as the  Truth In Lending Act and implementing Regulation Z, (12 C.F.R part 1026).

3. Defendant Bayview Loan Servicing LLC is a Delaware Limited Liability Company, whose managing member, David E. Quint, is a citizen of Florida.  This Defendant will be referred to hereafter as Bayview.  Bayview's principal place of business is located in Coral Gables, Florida.  Because a limited liability company is a citizen of every state in which its members are citizens for purposes of diversity jurisdiction, Bayview is a citizen of Florida .

4. In this action, Plaintiff pursues a claim under 12 U.S.C §2601, et. seq. (the Real Estate Settlement Procedures Act or RESPA), against Chase, and a claim under 15 USC. § 1601 *et. seq*.(The Fair Debt Collection Practices Act, or FDCPA).  Thus, this action presents a federal question giving this Court subject matter jurisdiction over that claim under 28 U.S.C. § 1331. Plaintiff also pursues additional claims arising under the common law of the State of Florida sounding in negligence against Chase.  This Court has diversity jurisdiction over these claims under 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Chase and the amount in controversy, including punitive damages, exceeds $75,000. In addition, this Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## II.  GENERAL ALLEGATIONS

5. Plaintiff owns a condominium located in the City of Miami, Florida,  In order to purchase that home, Plaintiff obtained a loan secured by a mortgage on that property.

6. The mortgage loan that Plaintiff obtained was originated by International Bankers Financial Group, that entity is not a party to this action.

7. Sometime after Plaintiff's mortgage was originated, it was sold on the secondary mortgage market to an investor. As of the date of this pleading, Plaintiff is not aware of the identity of that investor.

8. Both Chase and Bayview are mortgage servicers as that term is defined by 12 C.F.R. § 1024.2. Neither Chase nor Bayview has ever owned the actual mortgage debt at issue in this case, and there is no contractual or debtor/creditor relationship between Plaintiff and either defendant.

9. In its final rule and official interpretations implementing the recently amended version of Regulation X, the Consumer Financial Protection Bureau describes the mortgage servicing industry as follows: [1]

> Mortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income.
>
> In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans.

---

[1] The text of this paragraph, as well as paragraphs    is quoted from the Final Rule and Official Interpretations promulgated by the Consumer Financial Protection Bureau, pages 14-17 Available at http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf (Last Visited on November 6th, 2014)

\*\*\*

Contracts between the servicer and the mortgage loan owner specify the rights and responsibilities of each party… servicer contracts govern servicer requirements to advance payments to owners of mortgage loans, and to recoup advances made by servicers, including from ultimate recoveries on liquidated properties.

Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. Such compensation structures incentivize servicers to ensure that investment in operations closely tracks servicer expectations of delinquent accounts, and an increase in the number of delinquent accounts a servicer must service beyond that projected by the servicer strains available servicer resources. A servicer will expect to recoup its investment in purchasing mortgage servicing rights and earn a profit primarily through a net servicing fee (which is typically expressed as a constant rate assessed on unpaid mortgage balances), interest float on payment accounts between receipt and disbursement, and cross-marketing other products and services to borrowers. Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers greatly vary in the extent to which they invest in customer service infrastructure. For example, servicer staffing ratios have varied between approximately 100 loans per full-time employee to over 4,000 loans per full time employee. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to consumers accordingly.

Servicers also earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements. As a result, servicers have an incentive to look for opportunities to impose fees on borrowers to enhance revenues. These attributes of the servicing market created problems for certain borrowers even prior to the financial crisis. For example, borrowers experienced problems with mortgage servicers even during regional mortgage market downturns that preceded the

financial crisis. There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose, improper force-placed insurance practices, and improper foreclosure and bankruptcy practices.

10. Plaintiff's mortgage loan is a federally related mortgage loan and is therefore covered by both the Real Estate Settlement Procedures Act and Regulation X.

11. Because neither Chase nor Bayview owns Plaintiff's mortgage loan, neither would not suffer any adverse financial consequences if that loan were foreclosed upon and sold for less than the outstanding principal amount owed on the mortgage.

12. Beginning in the year 2000, Chase began force-placing flood insurance on Plaintiff's property, and applying the related charges to his mortgage loan account.  None of those force-placed insurance transaction however were appropriate because Plaintiff's property is located within a condominium association that always maintained insurance coverage that was sufficient to satisfy Plaintiff's obligations under the mortgage documents. However, Chase did not notify Plaintiff of these force-placed insurance transactions until the year 2011.

13. The premium for each of the multiple force-placed flood insurance policies was more than $5,000. Notably, superior coverage was available in the voluntary market for less than $500 per year, and even if the force-placement were authorized by the mortgage documents (and it was not), the charges assessed to Plaintiff were patently unreasonable.

14. Chase procured the multiple overpriced force-placed flood insurance placed flood insurance through Assurant Inc. or its subsidiaries.   Notably, pursuant to a complex web of agreements, Assurant funneled nearly 75% of the premium associated with this force-placed insurance back to Chase through an arrangement with Banc One Insurance Company, a wholly owned Chase subsidiary.

15. Beginning in 2011, Chase applied the premiums for the wrongfully procured force-placed flood insurance to Plaintiff's mortgage loan account, and dramatically increased the amount of money demanded for the monthly mortgage payments.  Plaintiff continued to pay the scheduled monthly mortgage payment, but did not pay the additional amounts demanded for the wrongful force-placed insurance.  This led Chase to inappropriately treat Plaintiff's mortgage loan as being in default, and ultimately to commence foreclosure proceedings.  As of the date of this pleading, the foreclosure lawsuit is still pending, except it is now being prosecuted by Bayview.

16. In 2010 , Congress passed the Dodd/Frank Wall Street Reform and Consumer Protection Act, which included substantial amendments to the Real Estate Settlement Procedures Act.  The Consumer Financial Protection Bureau was charged with developing implementing regulations.  Both the Dodd/Frank amendments to RESPA and the related amendments to Regulation X became effective on January 10th, 2014.

17. As the correspondence attached hereto as Exhibit "A" explains, Plaintiff, through counsel, and pursuant to the newly modified error resolution procedures notified Chase of its errors related to force-placed insurance causing a wrongful foreclosure.  That correspondence, expressly invokes the amended error resolution procedures found in RESPA and Regulation X (12 C.F.R 1024.35).

19. Chase responded to Plaintiff's Notice of Error on October 21st, 2014 . A true and correct copy of Chase's response is attached hereto as Exhibit "B, without the voluminous attachments.  That letter inexplicably asserts that no error occurred.

20. Regulation X (12 C.F.R § 1024.35 (e)) unambiguously requires that upon receipt of a Notice of Error, the servicer must respond to the notice of error by either:

>   (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance;
>
>   or
>
>   (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

### COUNT I – VIOLATION OF THE ERROR RESOLUTION PROCEDURES ESTABLIHSED BY RESPA AND REGULATION X (AGAINST CHASE)

21.     Plaintiff re-alleges and incorporates by reference her allegations in Paragraphs 1 through 20 above.

22.     This is an action for actual damages, statutory damages, attorney's fees and litigation costs brought pursuant to RESPA (12 U.S.C. 2605(f)).

23.     Through his Qualified Written Request/Notice of Error attached hereto as Exhibit "A" Plaintiff alerted Chase that it had inappropriately assessed exorbitant charges for force-placed insurance to his account, thereby causing a wrongful foreclosure.

24.     Chase was therefore obligated to perform a reasonable investigation and correct this undeniable error.  However, as Chase's response attached hereto as Exhibit "B" reflects, Chase refused to correct the error insisting that no error occurred.

25.     Furthermore, it is apparent that Chase did not conduct a reasonable investigation. Instead, Chase appears to take the position that Plaintiff must prove, more than ten years, later that the property was covered by voluntary flood insurance.  However, absolutely nothing in any

relevant contract or law placed the burden of proof upon Plaintiff concerning this issue. The mortgagee may only procure force-placed insurance if it has a reasonable basis to believe that there has been a lapse of voluntary coverage. Chase simply had no reasonable basis to believe that in this case.

26. While Plaintiff can, and will, provide evidence of voluntary coverage for the entire time period that Chase placed force-placed insurance, the fact that Plaintiff did not incorporate these documents into his original Notice of Error in no way absolved Chase of its obligation to investigate the asserted error, and make appropriate corrections. It is clear from Chase's attached response that it did not do that.

27. As a result of Chase's violation of the RESPA/Regulation X error resolution procedures, Plaintiff has been damaged. These damages include the misapplied funds, additional unwarranted finance charges flowing from the payment application error, costs associated with preparing and sending Plaintiff's Qualified Written Request/Notice of Error, the cost of legal services associated with the anticipated future foreclosure, and emotional distress.

28. Chase's deficient response to Plaintiff's Notice of Error is consistent with a pattern and practice by Chase whereby it routinely fails to comply with the RESPA/Regulation X error resolution procedures.

29. Shelia Lewis, another borrower whose mortgage loan is served by Chase and who is also represented by the undersigned, has submitted two RESPA Notices of Error concerning similar improper force-placed insurance and wrongful foreclosure related errors. Chase similarly failed to investigate and correct its errors in response to both of those Notices. That matter is currently being litigated in the 20th Judicial Circuit in and for Collier County Florida (Case No. 13-CA-0118).

30. Arelis Nunez, a third borrower whose mortgage loan was serviced by Chase and who is also represented by the undersigned submitted two notice of errors to Chase after it failed to properly process a loan modification agreement, and ultimately foreclosed upon Ms. Nunez home *after* she complied with the agreed upon loan medication.  Both times, Chase failed to investigate and correct the errors Ms. Nunez, through counsel, asserted in her Notices of Error. That matter is now being litigated in the United States District Court for the Middle District of Florida. (Case No. 6:14-cv-01485-GAP-GJK)

31. Thus, among the small number of clients that the undersigned represents who have invoked the RESPA /Regulation X error resolution procedures in an effort to address serious servicing errors by Chase, Chase has failed to comply with its obligations in each and every case, mishandling five out five Notices of Error.

32. Similarly, in *Marais v. Chase Home Finance LLC.,*  2014 WL ---F.3d--- (Southern District of Ohio June 4th, 2014)(Case No. Case No. 2:11–cv–314), the Court discusses similar failures by Chase to substantively respond to the plaintiff/borrower's RESPA correspondence.

33. Despite its express obligation under RESPA and Regulation X, Chase has wholly failed to implement adequate policies, procedures, training, and personnel in order to enable it to properly correct asserted servicing errors in the manner required by federal law.  The Court in *Marais* also explained in detail Chase's obligations under the earlier and less stringent version of RESPA, yet Chase appears to have done nothing to improve its procedures and continues to callously disregard borrowers' efforts to invoke the RESPA/Regulation X error resolution process arising from Chase's insufficient mortgage serving operations.

34. As a result of Chase's violation of the RESPA/Regulation X error resolution procedures, Plaintiff has been damaged. His damages included unwarranted fees and charges applied to his account, legal fees associated with defending himself from the wrongful foreclosure, damage to his credit rating, emotional distress, and the costs of preparing and mailing the Notice of Error,

35. The deficiencies in Chase's response to Plaintiff's Notice of Error are the consequence of Chase's failure to maintain sufficient policies, procedures, personal, training and business systems to comply with RESPA and Regulation X, combined with willful disregard of its obligations and complete lack of concern for the borrowers whose loans it services. Chase's acts and omissions constitute a pattern and practice of non-compliance with RESPA and Regulation X. Accordingly, Plaintiffs are entitled to an award of statutory damages, in addition to actual damages and attorneys fees.

36. Plaintiff has retained undersigned counsel to represent him in this action and is entitled to an award of prevailing party attorney's fees pursuant to the attorney fee shifting provisions of RESPA found at 12 U.S.C §2605(f)(3).

WHEREFORE, Plaintiff demands trial by jury and respectfully requests that this Honorable Court enter judgment in his favor in the total amount of his damages as determined at trial, together with an award of attorney's fees, litigation costs, and statutory damages.

## COUNT II. – NEGLIGENCE (Against Chase)

37. Plaintiff re-alleges and incorporates by reference her allegations in Paragraphs 1 through 22 above.

38. This is an action for damages, including punitive damages, in excess of $75,000, exclusive of interest, attorneys' fees, and litigation costs.

39. Regulation X (12 C.F.R § 1024.35 (e)), imposes an affirmative obligation upon Chase to investigate and correct errors identified by a borrower through a Qualified Written Request/Notice of Error. By failing to properly investigate and correct the errors asserted in Plaintiff's attached Notice of Error, Chase breached that duty.

40. As a mortgage servicer entrusted with procuring force-placed insurance to protect the mortgagee's collateral, Chase had a duty to refrain from procuring force-placed insurance when the property was appropriately covered by voluntary coverage. Chase breached that duty when it procured grossly overpriced force-placed insurance on Plaintiff's account because that insurance was wholly unnecessary and duplicative, and was not authorized by the agreement between Plaintiff and the mortgagee/investor that employed Chase.

41. Chase's failures to comply with its statutory, regulatory, and common law duties are willful or wanton, and are also the consequences of Chase's decision to unreasonably profit from force-placed insurance and keep the costs of its servicing operations unreasonably low, without adequately protecting Plaintiff and similarly situated borrowers from foreseeable injuries arising from inadequate servicing.

42. As a result of Chase's negligence, Plaintiff has been damaged. Plaintiff's damages include the inappropriate charges applied to his mortgage loan account and related finance charges, damages to his credit rating, and expenses associated with defending himself in the wrongful foreclosure action.

43. In order to deter similar wrongful conduct in the future and vindicate the deterrent function of tort law, an award of punitive damages in this case is appropriate and necessary.

WHEREFORE, Plaintiff demands trial by jury and respectfully requests that this Honorable Court enter judgment in his favor in the total amount of his damages as determined at

trial.

## COUNT III VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (AGAINST BAYVIEW)

44. This is an action for actual damages, statutory, damages, attorneys fees and litigation costs brought pursuant to the Fair Debt Collection Practices Act, 15 U.SC. § 1601 *et. seq*.

45. Plaintiff re-alleges and incorporates by reference her allegations in Paragraphs 1 through 15 above.

46. On or about July 1st, 2014, Bayview represented to the state court where the foreclosure action is pending that it had acquired the mortgage and promissory note on March 27th, 2014, and obtained an order substituting itself as the foreclosure plaintiff in that action. Plaintiff disputes the veracity of that representation, as Bayview is merely the loan servicer and has never actually acquired an ownership interest in the mortgage and promissory note. However, since Bayview did begin servicing the subject loan once it was already regarded by the creditor as being in default, Bayview is a "debt collector" as that term is defined by 15 USC 1692a(6).

47. The Fair Debt Collection Practices Act prohibits a debt collector from making false or misleading statements concerning "…the character, amount, or legal status of any debt." 15. U.S.C. § 1692e(2)(a).

48. Through the foreclosure proceedings, Bayview has become aware of the basis for Plaintiff's challenge to the charges associated with force-placed insurance, but continues to pursue collection of those amounts representing that the wrongfully assessed force-placed insurance premium is collectable as additional debt because it was appropriately advanced under

the terms of the mortgage. However, this is not true, and Bayview's representations are represent a false representation concerning the character, amount, and legal status of that portion of the mortgage debt attributed to force-placed insurance. Accordingly, Bayview has violated the above cited provision of the FDCPA.

49. Bayview's false representations have prolonged the foreclosure action and exposed Plaintiff to additional damages including additional expense associated with the defense of the foreclosure action, further harm to his credit, and additional emotional distress.

50. Plaintiff has also invoked the RESPA/Regulation X error resolution procedures in connection with this error as it pertains to Bayview. As of the date of this pleading, the deadline to investigate and correct that error has not yet run. If Bayview fails to remove the force-placed insurance charges, Plaintiff intends to amend this Complaint to assert additional claims against Bayview arising under RESPA and any other appropriate claims.

WHEREFORE, Plaintiff demands trial by jury and respectfully requests that this Honorable Court enter judgment in his favor in the total amount of his damages as determined at trial, together with an award of attorney's fees, litigation costs, and statutory damages.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial by jury on all claims so triable.

Respectfully Submitted,

THE LAW OFFICES OF JEFFREY N. GOLANT, P.A.

1000 W. McNAB RD. STE. 150
POMPANO BEACH, FL 33069
Phone:  (954) 942-5270
Fax:     (954) 942-5272
Email:   jgolant@jeffreygolantlaw.com
By: **/S/ JEFFREY N. GOLANT ESQ.**
Fla. Bar. No. 0707732
Counsel for Plaintiff Marco Hernandez