**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 14-24254-CIV-GOODMAN**

**[CONSENT CASE]**

MARCO J. HERNANDEZ,

      Plaintiff,

v.

J.P. MORGAN CHASE BANK N.A.,

      Defendant.

_____/

## ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION

This dispute arises from two letters exchanged between a mortgagor and a mortgagee concerning the mortgagee's forced placement of flood/hazard insurance on the mortgagor's property, a condominium apartment. The mortgagee's compliance (or noncompliance) with the statutory scheme governing the error resolution process and communications between lenders and consumers is at the core of Plaintiff's claim.

Plaintiff originally filed this action against J.P. Morgan Chase Bank N.A. ("Chase")[1] for (1) violating the error resolution procedures established by the Real

---

[1] Plaintiff's Complaint [ECF No. 1], First Amended Complaint [ECF No. 13] and Second Amended Complaint [ECF No. 32] also name Bayview Loan Servicing LLC ("Bayview") and Manufacturers and Traders Trust Company ("MT&T") as co-defendants. However, the claims against those two defendants were settled and dismissed. [ECF Nos. 67; 68].

Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e),[2] and for (2) negligence. [ECF No. 32]. However, the Undersigned dismissed those claims without prejudice and allowed Plaintiff "one final opportunity to state a claim" in a Third Amended Complaint. [ECF No. 77]. Plaintiff filed a Third Amended Complaint on January 3, 2016. [ECF No. 84].

In the Third Amended Complaint, Plaintiff re-alleged one claim from the previous complaints -- (1) the RESPA violation -- and *added* two new claims: (2) tortious interference with a business relationship and (3) violation of a fiduciary duty. [*Id.*]. Chase moved [ECF No. 93] to dismiss Plaintiff's Third Amended Complaint on three grounds: (1) Chase fully complied with its RESPA obligations; (2) Plaintiff failed to adequately plead that any alleged damages were **caused** by an alleged RESPA violation; and (3) Plaintiff's new claims are barred by a class action settlement in which Plaintiff was allegedly a class member. [ECF No. 93]. The Undersigned denied that motion to dismiss primarily because of Chase's reliance on extrinsic documents that the Court could not rely upon without transforming the motion to dismiss into a summary judgment motion. [ECF No. 110].

Chase now moves for summary judgment. [ECF No. 106]. Plaintiff filed a response [ECF No. 117], Chase filed a reply [ECF No. 126], Plaintiff filed a notice of

---

[2]      This statutory requirement is supplemented by "Regulation X," 12 C.F.R. § 1024.35(e), which is discussed in more detail below.

supplemental authority [ECF No. 134], and Chase filed a notice of supplemental authority [ECF No. 135]. Additionally, Chase filed a motion to strike inadmissible evidence that Plaintiff submitted in opposition to the summary judgment motion. [ECF No. 127]. The Undersigned granted that motion in part [ECF No. 133], striking correspondences sent by Brown & Brown, Inc. [ECF No. 120-1] and a website printout appearing to be from a Freddie Mac website [ECF No. 81-5]. The Undersigned will consider the remaining evidence on the record.

For the reasons outlined below, the Undersigned **denies** Chase's motion for summary judgment in large part and **grants** it in small part.

I.      FACTS[3]

On April 11, 1996, Plaintiff obtained a loan with a principal balance of $86,250.00 from Chase Manhattan Mortgage Corporation, secured by a mortgage on his property at 540 Brickell Key Drive, 1103, Miami, Florida 33131 (the "Property"). [ECF Nos. 75-1, pp. 11, 27; 75-2]. Plaintiff stopped paying his mortgage in November 2010. [ECF No. 75-1, pp. 96, 102, 110, 114]. Plaintiff stopped making his mortgage payments because Chase charged the cost of lender-placed flood insurance policies to Plaintiff's mortgage account, which increased the amount of his monthly mortgage payments to an amount

---

[3]      The facts stated here are uncontroverted, based upon Chase's Statement of Undisputed Material Facts [ECF No. 107] and Plaintiff's Response to the Statement of Undisputed Material Facts [ECF No. 118].

he could not afford to pay. [ECF No. 75-1, pp. 99-100]. Chase was the prior servicer of Plaintiff's loan. [ECF No. 84, ¶¶ 2, 7, 34].

On November 8, 2012, Chase initiated a foreclosure action by filing a complaint to foreclose the mortgage in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County (the "Foreclosure Action"). [ECF Nos. 75-1, p. 121; 76-1]. The Foreclosure Action was dismissed on June 6, 2015. [ECF Nos. 75-1, p. 121; 76-2].

On September 10, 2014, Plaintiff's counsel sent Chase a "Qualified Written Request/Notice of Error/Request for Information" (the "NOE"), which outlined a number of alleged "serious errors" in the servicing of the Loan and requested that Chase respond in writing to address these alleged errors. [ECF Nos. 32-1; 75-3; 84, ¶ 29]. Plaintiff attached to the NOE a copy of a flood insurance policy effective March 2, 2011 to March 2, 2012 for his condominium. [ECF No. 75-3, pp. 8-10]. Chase responded in an October 22, 2014[4] letter (the "NOE Response"). [ECF Nos. 32-2; 75-4; 84, ¶ 32].

In Chase's NOE Response, it claimed that it had conducted an investigation into Plaintiff's allegations but found no errors. [ECF No. 75-4]. In responding to Plaintiff's NOE, Chase followed the standard procedures and policies it had implemented in order

---

[4]     As outlined later in this Order, the applicable federal regulation requires the servicer (e.g., Chase) to respond within thirty (30) days of receiving the letter.  Chase's October 22, 2014 letter is dated 42 days from counsel's September 10, 2014 letter. The Third Amended Complaint does not allege when counsel's original NOE was received, and Plaintiff has not argued that the NOE Response was untimely. In fact, Plaintiff's Response to Chase's Statement of Undisputed Material Facts affirms Chase's statement that the NOE Response was "timely" as undisputed. [ECF No. 118, p. 1].

to respond to NOEs. [ECF No. 75-6, pp. 7-8, 13-14, 18]. Chase's NOE Response explained that it had "completed [its] review" of Plaintiff's allegations but "confirmed" that there were no errors with the loan. [ECF No. 75-4]. However, Chase's NOE Response did state that the proof of coverage provided in the NOE showed a coverage period from March 2, 2011 to March 2, 2012, so a partial refund was therefore posted to Plaintiff's loan. [*Id.*]. Additionally, Chase encouraged Plaintiff to provide proof of flood insurance coverage for the remaining years and advised Plaintiff that it would cancel those policies and issue refunds upon receipt of such proof. [ECF Nos. 75-4, p. 1; 75-5, pp. 49-50].

Subsequently, the servicing of Plaintiff's loan was transferred to M&T Bank and Bayview Loan Servicing. [ECF No. 104-1, p. 6]. After the loan servicing was transferred, Plaintiff provided Bayview with proof of insurance coverage. [ECF No. 104-1, p. 9]. Chase thereafter refunded charges for lender-placed insurance imposed on Plaintiff's loan account. [ECF No. 104-1, pp. 9-10]. The refund process to Plaintiff was completed on or about December 2014, after the service transfer from Chase. [ECF No. 104-1, pp. 9, 11].

On November 10, 2014, Plaintiff filed this lawsuit and asserted a claim for violation of RESPA and Regulation X set forth in 12 U.S.C. § 2605(f), as well as a state law claim for negligence. [ECF No. 1]. On January 3, 3016, Plaintiff filed his Third Amended Complaint, again asserting his RESPA Claim, abandoning his negligence

claim, and asserting two new claims for tortious interference with a business relationship and violation of a fiduciary duty. [ECF No. 84]. Plaintiff again seeks actual damages and statutory damages, along with attorneys' fees and litigation costs, claiming Chase breached its duties under RESPA and Regulation X by failing to conduct an adequate investigation upon receipt of Plaintiff's NOE. [ECF No. 84, ¶¶ 38-50].

Plaintiff claims that his actual damages include "unwarranted fees and charges applied to his account, legal fees associated with defending himself from the wrongful foreclosure, damage to his credit rating, emotional distress, and the cost of preparing and mailing the Notices of Error, including the Notice of Error that he sent to Bayview after Chase failed to adequately respond." [ECF No. 84, ¶ 51].

On May 1, 2012, plaintiff Shelly A. Clements filed an action (the "*Clements Action*") on behalf of herself and other similarly situated customers of Chase, in which she asserted claims against Chase for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and the California Unfair Competition Law. [ECF No. 94-1, ¶ 3]; *Clements v. JP Morgan Chase Bank, N.A.*, Case No. 12-cv-02179, ECF No. 50-1 (Settlement Agreement) (N.D. Cal. May 1, 2012). Clements alleged, among other things, that Chase "unlawfully required its customers to carry *excessive* flood insurance for their property, and that [Chase] unfairly profited from receiving *kickbacks*

in connection with lender-placed flood insurance, including in the form of 'commissions'" [*Id.*] (emphasis supplied).

On November 26, 2013, the parties reached a nationwide settlement regarding all claims concerning lender-placed flood insurance on loans serviced or owned by Chase ("*Clements* Settlement"). [ECF No. 94-1]. Pursuant to the *Clements* Settlement, class members agreed to release "[c]laims that exist in their favor through the date of this Settlement Agreement." [*Id.*, at ¶ 59]. "Released Claims" included "all claims actually made or that could have been made on behalf of Settlement Class Members based on the facts asserted in the Consolidated Amended Complaint through the date this Settlement Agreement is executed." [*Id.*, at ¶ 2(aa)]. The *Clements* Class Members agreed not to bring suit against Chase based upon the Released Claims. [*Id.*, at ¶ 59]. On June 6, 2014, the *Clements* Court entered an Order and Judgment Granting Final Approval of Class Action Settlement, Class Counsel Attorneys' Fees, Expenses and Service Awards ("Final Judgment"). [ECF No. 94-2]. In the Final Judgment, the court certified the following settlement class:

> All persons in the United States who were charged by JPMorgan for lender-placed flood insurance (unless such charge was flat cancelled/refunded in full) in connection with a Closed-End Residential Mortgage during the time period from January 1, 2007 to July 31, 2012, excluding Defendants, their affiliates, subsidiaries, agents, board members, directors, and employees, and pursuant to Paragraph 61 of the Settlement Agreement, all Class Members whose Class Notices were returned as non-deliverable.

[*Id.,* at ¶ 5].

The court held that any Settlement Class Members who did not opt out would "conclusively be deemed to have released and discharged Released Parties, as that term is used in the Settlement Agreement, from any and all Released Claims, as that term is defined in the Settlement Agreement." [*Id.*, at ¶ 16].

On February 25, 2014, Plaintiff was sent a Notice of Class Action Settlement ("Notice of Settlement"). [ECF No. 103-1, p. 1]. The Notice of Settlement informed Plaintiff of the claims litigated in the *Clements* case [*id.*, at p. 4], his right to opt-out of the *Clements* Settlement [*id.*, at pp. 7-8], the release of his claims if he chose not to opt-out [*id.*, at p. 7], and the actions he needed to take to opt-out [*id.*, at p. 8]. The deadline to opt-out of the *Clements* Settlement was April 28, 2014. [*Id.*, at p. 5]. Plaintiff did not opt-out or submit a request for exclusion from the class. [*Id.*, at p. 2]. On September 25, 2014, Plaintiff was mailed a settlement check for the amount of two thousand five-hundred two dollars and sixty-four cents ($2,502.64), and the check was cashed. [*Id.*]. On June 10, 2015, Plaintiff was mailed a second check for the amount of one thousand two hundred and forty-eight dollars and seventy-seven cents ($1,248.77), and that check was also cashed [*Id.*].

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings, depositions, affidavits, and exhibits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Tyson*, 121 F.3d at 646. When evaluating a summary judgment motion, a court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether the evidence could reasonably sustain a jury verdict for the non-movant. *Celotex*, 477 U.S. at 322-23; *Tyson*, 121 F.3d at 646.

## III.    LEGAL ANALYSIS

### A.    <u>Whether Chase complied with RESPA and Regulation X.</u>

#### 1.    *RESPA Legal Standard*

RESPA was enacted, in part, to ensure "that consumers throughout the Nation are provided with greater and timelier information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). It provides that borrowers may inquire about federally related mortgages by making a "qualified written request." 12 U.S.C. § 2605(e)(1)(A).

The term "qualified written request" is defined in 12 U.S.C. § 2605(e)(1)(B): it is a request that, *inter alia*, (a) describes why a borrower believes her "account is in error," or

(b) "provides sufficient detail to the servicer regarding other information sought by the borrower." *Id.* The servicer is required to provide a written acknowledgment of the request within five days, and must respond within thirty days. *Id*. § 2605(e)(2). Additionally, Section 2605(e)(2) requires servicers -- "[n]ot later than 30 days . . . after the receipt from any borrower of any qualified written request" -- to:

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
> (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

*Id.* § 2605(e)(2).

However, on January 10, 2014, a new regulatory regime went into effect through the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010. Pub. L. No.

10

111–203, 124 Stat. 1376 (July 21, 2010) ("Dodd–Frank Act"). Pursuant to the Dodd–Frank Act, new regulations were promulgated: the "Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X)," codified at 12 C.F.R. § 1024. Notably, the new regulation delineates separate procedures for responding to a borrower's Notice of Error and a borrower's Request for Information. The regulations impose the following obligations upon a servicer concerning its response to a Notice of Error:

> (e) Response to notice of error.
>     (1) Investigation and response requirements.
>         (i) In general[,] . . . a servicer must respond to a notice of error by either:
>             (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; **or**
>             (B) Conducting a reasonable investigation **and** providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e) (emphasis added).

Therefore, if a servicer selects option (B), then it has two obligations:   (1) conducting a reasonable investigation, and (2) providing a written response containing certain types of information and disclosures.

### 2. *Application to Plaintiff's Case*

Plaintiff's NOE specifically claimed:

> Beginning in 2011, or perhaps even earlier than that, Chase began force-placing flood insurance on [Plaintiff's] property. The force-placement was in error, because as mentioned above, [Plaintiff's] condominium association always maintained appropriate flood insurance coverage. A true and correct copy of the Association's flood insurance declarations page is attached hereto[.] . . . At some point, Chase . . . recognized that the Association maintained flood coverage, and purported to cancel at least some of the force-placed coverage. Correspondence from Chase documenting this cancellation is attached hereto[.]

[ECF No. 32-1, p. 2].

The NOE then noted that foreclosure proceedings had recently been commenced against Plaintiff, because, at least in part, Plaintiff purportedly missed several monthly payments due to an increase in his premiums that resulted from the force placed insurance policies. [*Id.*]. Plaintiff reiterated that his condominium association always maintained the required level of flood insurance, so no force placed insurance charges should have ever been applied to the account. [*Id.*]. Plaintiff then invoked RESPA and Regulation X to implore Chase to investigate and correct the errors. Additionally, Plaintiff requested specific information and documentation concerning his escrow and force placed insurance policies. [*Id.*, at p. 3].

The documents attached to the NOE are (1) a letter purportedly from Chase stating that force placed insurance coverage was cancelled effective December 1, 2013 because Plaintiff allegedly provided proof of flood insurance coverage [*Id.*, at p. 5], and

(2) a flood insurance policy declaration from Hartford Insurance Company indicating that a policy was in place for Plaintiff's building from March 2, 2011 to March 2, 2012 [*Id.*, at pp. 7-8].

It is uncontested that Plaintiff submitted a "qualified written request" triggering the RESPA provisions requiring Chase to formally respond. Chase chose to respond pursuant to 12 C.F.R. § 1024.35(e)(1)(i)**(B)**, which applies when a servicer determines that there has been no error with the account. Chase's letter stated in relevant part:

> We've completed our review and confirmed that there hasn't been any error with the loan because:
>
> We have not received all required proof of hazard and flood insurance coverage for this loan between the timeframe of November 29, 2000, to March 2, 2011. Lender placed policies were charged to the loan each year between this timeframe.
>
> The Lender placed policy effective December 2, 2010, to December 2, 2011, was cancelled, effective March 2, 2011, due to proof of coverage being received. The proof of insurance coverage with Hartford Insurance Company shows a policy period from March 2, 2011, to March 2, 2012. A partial refund of $5,823.08 has been posted to the loan.
>
> For your convenience, we have attached copies of the [requested documents].
>
> To have cancellations and refunds processed for all prior lender placed policies, proof of insurance coverage is needed to show that the property was covered from November 29, 2000, to March 2, 2011.

[ECF No. 32-2, p. 1].

In its summary judgment motion, Chase claims that it complied with RESPA and Regulation X by conducting a reasonable investigation and providing a sufficient

written response. [ECF No. 106, pp. 10-12]. To support its claim that a reasonable investigation was undertaken, Chase relies on the deposition testimony of Jeffrey Nack [ECF No. 75-5] and Tameria Hudson [ECF No. 75-6], both of whom are *presumably* Chase employees with some basis of knowledge about Plaintiff's specific NOE (and Chase's subsequent Response), as well as Chase's standard procedures for addressing RESPA and Regulation X notices of error.

Chase, however, provides no foundation to support the testimony of these two individuals. The selections from the deposition transcripts submitted in support of the summary judgment motion include cover pages indicating the technical when, where and whom of the deposition, but then skip the necessary foundation -- i.e., who exactly the individual is, what his/her basis of knowledge is, for whom he/she works, what his/her job title is, etc. Without this information, it is impossible for the Court to assess whether the facts asserted are disputed or not.

Furthermore, Chase's lack of foundation is noteworthy because Chase filed a motion [ECF No. 127] to strike evidence submitted by Plaintiff in opposition to the summary judgment motion for an alleged lack of foundation. While Chase's evidence [ECF Nos. 75-5; 75-6] technically complies with Federal Rule of Evidence 56(e) in that it is accompanied by an authenticating affidavit [ECF No. 75], that does not necessarily make it at all useful to the Court in deciding summary judgment. Because the deposition testimony of Nack and Hudson is presented without any context, the Court

does not know the source of their apparent knowledge and therefore cannot afford any weight to their statements about the handling of Plaintiff's NOE and Chase's standard procedures concerning RESPA.

Additionally, Plaintiff supports his opposition to summary judgment with evidence (with the appropriate foundation) that raises questions of material fact concerning Chase's claim of having conducted a reasonable investigation. Plaintiff argues that if Chase had actually conducted a reasonable investigation, then it would have uncovered evidence of the several times during the ten-year period that he (through his homeowner's association) provided proof of flood insurance coverage on his property. [ECF No. 117, pp. 6-7].

Plaintiff submitted an affidavit stating that "[a]lthough [he] cannot remember the specific dates, there were several times between the years 2000 and 2011 (and even after 2011) when [he] received correspondences from . . . Chase requesting proof of flood insurance coverage. . . . Every time [he] received a request . . . , [he] contacted the building management and ensured that the appropriate building employee promptly provided the requested proof of coverage." [ECF No. 81-2, p. 2].

To support this claim that Chase was notified on numerous occasions about the wrongful placement of flood insurance on his property, Plaintiff submitted a March 18, 2010 letter from Chase Home Finance LLC [ECF No. 97-2], which acknowledges the cancellation of flood insurance effective December 2, 2008 based upon Plaintiff

providing proof of other insurance coverage. Chase's Response to the NOE claiming that there is no error with his account does not acknowledge that Plaintiff previously addressed notifications from Chase, nor does it mention the March 2010 letter acknowledging the cancellation of force placed coverage. [ECF No. 75-4].

So, even if the Court were to accept the context-free testimony of Chase's witnesses about the investigatory procedure undertaken that found no evidence of communications from Plaintiff's homeowner's association providing proof of coverage on several occasions, this is a factual dispute for the jury, not an issue for summary judgment resolution. To be sure, a jury could conclude that Plaintiff has no credibility and that his contentions about providing proof of coverage are without merit because, perhaps in part, the association may not confirm this. However, a jury might also conclude otherwise and find his story credible. "The contradiction presents a classic swearing match, which is the stuff of which jury trials are made." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).

Therefore, based upon these submissions by Plaintiff (and Chase's inadequate foundation to support its assertion of a reasonable investigation), the Undersigned finds that the evidence could reasonably sustain a jury verdict for the non-movant. *See Celotex*, 477 U.S. at 322-23; *Tyson*, 121 F.3d at 646.

16

## B.      Whether Plaintiff provided sufficient evidence of damages.

Chase next claims that Plaintiff cannot establish damages as statutorily required by RESPA.

If a servicer fails to comply with RESPA, then the borrower may recover "any actual damages to the borrower as a result of the failure," as well as statutory damages "in the case of a pattern or practice of noncompliance." 12 U.S.C. § 2605(f)(1)(A)–(B). A plaintiff must show facts "establishing a causal link between the financing institution's violations and [his] injuries." *McClean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010). "[D]amages are an essential element in pleading a RESPA claim." *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016).

In the Third Amended Complaint, Plaintiff alleges that "[h]is damages include[] unwarranted fees and charges applied to his account, legal fees associated with defending himself from the wrongful foreclosure, damage to his credit rating, emotional distress, and the costs of preparing and mailing the Notices of Error, including, but not limited to, the Notice of Error that he sent to Bayview after Chase failed to adequately respond." [ECF No. 84, p. 14].

Plaintiff's Third Amended Complaint acknowledges that the fees and charges applied to his account were eventually removed. [*Id.*, at p. 14 n. 4]. Additionally, the default and foreclosure proceedings were already underway at the time that Plaintiff sent the NOE. [*Id.*, at pp. 6, 8]. However, just as at the motion to dismiss stage, the

17

Undersigned still recognizes, as an acceptable form of recoverable damages, that Chase's "'RESPA violation could plausibly have exacerbated the foreclosure proceedings and led Plaintiff to suffer additional harm that he would not have experienced absent the violation.'" [ECF No. 110, p. 15] (quoting *Burdick v. Bank of America, N.A.*, 99 F. Supp. 3d 1372, 1380 (S.D. Fla. 2015)).

Furthermore, Plaintiff also claims that the RESPA violation required the additional expense of sending a second notice of error to Chase's successor. Such an expense could also be recoverable in addition to the damages of an exacerbated foreclosure process. *See Miranda v. Ocwen Loan Servicing, LLC*, --- F. Supp. 3d --- , No. 15–61434–CIV, 2015 WL 7767209, *4 (S.D. Fla. Dec. 2, 2015) ("alleged photocopying costs, postage costs, and reasonable attorney's fees incurred after an incomplete or insufficient response to a [notice of error] are actionable under RESPA.") (citing *Rodriguez v. Seterus, Inc.*, No. 15–61253–CIV, 2015 WL 5677182, *2–3 (S.D. Fla. Sept. 28, 2015); *Russell v. Nationstar Mortg., LLC*, No. 4–61977–CIV, 2015 WL 541893, *2 (S.D. Fla. Feb. 10, 2015).

Chase refers [ECF No. 106, pp. 14-15] the Court to *Lage v. Ocwen Loan Servicing LLC*, where United States District Judge Beth Bloom (Southern District of Florida) concluded that costs incurred while preparing and sending the NOE "cannot serve as a basis for damages because, at the time those expenses occurred, there has been no RESPA violation." 145 F. Supp. 3d 1172, 1197 (S.D. Fla. 2015). Judge Bloom's finding is not relevant in the present case because Plaintiff does not claim damages for the filing

of the original NOE to Chase (as was the case in *Lage*), but rather seeks costs associated with the filing of a *second* NOE that he was forced to file because Chase allegedly did not comply with RESPA the first time around. The Undersigned finds that there is a sufficiently direct causal link between Plaintiff's claim of damages and the underlying alleged RESPA violation.

The *Lage* court also concluded that the plaintiffs could not causally link their emotional distress to the purported RESPA violation. *Id.* at 1196. Specifically, that court determined that, based upon the evidence on the record, the plaintiffs were unable to distinguish the emotional harm they suffered based upon foreclosure proceedings and the emotional harm resulting from the defendant's failure to properly respond their notice of error. *Id.* Chase points to Plaintiff's deposition testimony to draw a parallel to *Lage*, emphasizing Plaintiff's statement that "[t]he emotional distress was already created since the foreclosure started." [ECF No. 75-1, p. 15]. However, this does not foreclose the possibility that Plaintiff's emotional distress was exacerbated by the alleged RESPA violation, which apparently elongated the foreclosure process.

The Undersigned is bound only by decisions of the United States Supreme Court and the Eleventh Circuit Court of Appeals. The decision of a federal district judge is not binding precedent in a different judicial district, the same judicial district -- or even upon the same judge in a different case. *Camreta v. Greene*, 563 U.S. 692 (2011); *Dow Jones & Co., Inc. v. Kaye*, 256 F.3d 1251, 1258 n. 10 (11th Cir. 2001); *Fishman & Tobin, Inc. v.*

*Tropical Shipping & Constr. Co., Ltd.*, 240 F.3d 956, 965 n. 14 (11th Cir. 2001). Therefore, the conclusion that the plaintiffs in *Lage* could not causally link their emotional harm to the RESPA violation in light of the intervening factor of the foreclosure process does not control here. Accordingly, in viewing the testimony in Plaintiff's favor, I find that there is a genuine issue of material fact to be resolved by a jury concerning Plaintiff's emotional distress.

For similar reasons, I am also not persuaded by Plaintiff's supplemental authority [ECF No. 135-1], *Berene v. Nationstar Mortgage LLC*, No. 14-61153, 2016 WL 3787558 (S.D. Fla. June 15, 2016), another district court opinion from this district concerning damages in a RESPA case. As in *Loge*, the district court in *Berene* did not find a causal link between the borrowers' alleged damages (the incurrence of additional fees during an allegedly-elongated foreclosure proceeding and the related emotional distress of that proceeding) and the alleged RESPA violation. *Id.* at *4.

As the Undersigned noted above, Plaintiff's alleged actual damages include the preparation and filing of a second NOE after Chase apparently inadequately responded to the original. The plaintiffs in *Berene* did not make that same claim. *Id.* Additionally, the plaintiffs in *Berene* submitted only rhetoric of distress caused by the lengthened foreclosure process, while Plaintiff in the present case testified to specific symptoms of distress arising from the RESPA violation exacerbating the foreclosure process. [ECF

No. 75-1, p. 16]. For these reasons, the Undersigned is not convinced that the result in *Berene* should be the result here.

Finally, Plaintiff points to *Renfroe v. Nationstar Mortgage, LLC*, 822 F.3d 1241 (11th Cir. 2016), to support his contention that he can still assert damages concerning the fees and charges applied to his account even though they were eventually removed. In *Renfroe*, the borrower's allegation that the mortgage servicer failed to refund her mortgage overpayments was sufficient to plead actual damages in her action alleging that the servicer violated RESPA by failing to properly respond to her notice of error indicating that it was overcharging her, even though overpayments were made before she sent notice of error. *Id.* at 1245-47.

*Renfroe* states, in relevant part, that "[w]hen a plaintiff plausibly alleges that a servicer violated its statutory obligations and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed." *Id.* at 1246-47. To be clear, *Renfroe* does not address a situation where the borrower received a refund at a later date, such as after the RESPA response deadlines expired. However, the Eleventh Circuit rejects the general idea that a servicer can avoid RESPA's consequences by incorrectly claiming no error (when there actually is one) and then simply correcting that error later:

> If RESPA reached only future harm, as Nationstar claims, § 2605(e)(2)(A)'s directive that servicers "make appropriate corrections in the account of the borrower [when there is an error], *including the crediting of any late charges or penalties*," would be meaningless because it could always be

circumvented. That is, a servicer notified of an account error could always avoid RESPA liability just by claiming it thought there was no error and correcting the error going forward. According to Nationstar, a RESPA cause of action would not accrue in this situation—despite the abusiveness of the tactic. We reject such a cramped reading of RESPA.

*Id.* (emphasis in original).

While *Renfroe* is not precisely on point factually, the Court still finds it instructive. Just as in *Renfroe*, RESPA would be rendered meaningless in this case if the "unwarranted fees and charges" applied to Plaintiff's account do not constitute damages because they were refunded at a later time, *after* the lawsuit was already initiated. RESPA directs servicers to "make appropriate corrections in the account of the borrower [when there is an error], *including the crediting of any late charges or penalties.*" 12 U.S.C. § 2605(e)(2)(A).

If a jury were to find that Chase's investigation was insufficient and that there was in fact an error with Plaintiff's account, then Chase would have been obligated under RESPA to refund to Plaintiff the various fees and charges that his account was charged. Chase did not do that. In fact, it was only *after* this lawsuit was filed and a second NOE was sent to the new servicer that the fees and charges applied to Plaintiff's account were removed. [ECF No. 104-1, pp. 9-11].

Chase's reading of RESPA, if adopted, would have an illogical and unfair effect. A servicer could, in effect, conduct no investigations and deny every notice of error without consequence, just as long as it corrected the error *if* ever it were confronted

22

about this practice (such as in a federal lawsuit, for instance). Thus, in these hypothetical circumstances, RESPA would be ineffective and provide no relief for those without the knowledge and/or wherewithal to bring a federal lawsuit. In the words of the Eleventh Circuit, accepting Chase's "argument would mean gutting RESPA." *Renfroe*, 822 F.3d at 1246.

Accordingly, the Undersigned finds that Plaintiff has established genuine issues of material fact to be resolved by the jury as to damages.

**C.    Whether Plaintiff's state-law claims are barred by *res judicata*.**

In its final argument, Chase asserts that Plaintiff's claims for tortious interference with a business relationship and violation of a fiduciary duty are barred by the *Clements* settlement.

"*Res judicata*, or claim preclusion, will prohibit a party from re-litigating a claim where a judgment on the merits (involving the same claim and the same parties) exists from a prior action." *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007). The principles of claim preclusion "apply to judgments in class actions as in other cases." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998).

Claim preclusion requires: "(1) a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) identity of the parties; [and] (4) identity of the causes of action." *Adams*, 493 F.3d at 1289. The parties do not contest the first two elements concerning *Clements*, as a final judgment was entered on the merits in that case by a

court of competent jurisdiction. *See Clements*, No. 12-02179, ECF No. 91 (N.D. Cal. June 6, 2014) (the district court's final order and judgment).

Plaintiff contends that (1) he is not a class member because he received a full refund for the flood insurance that was force-placed on his property and (2) that the causes of action asserted here and in *Clements* are sufficiently differentiated to prevent the *Clements* settlement from baring the state claims alleged here. For the following reasons, the Undersigned disagrees with Plaintiff and concludes that Plaintiff **is** a *Clements* class member; however, the Undersigned also disagrees with Chase and finds that the release in *Clements* does not apply to Plaintiff's state-law claims (for the most part).

### 1.      *Plaintiff is a member of the <u>Clements</u> settlement class.*

As noted above, the following facts are undisputed:

On February 25, 2014, Plaintiff was sent a Notice of Class Action Settlement ("Notice of Settlement"). [ECF No. 103-1, p. 1]. The Notice of Settlement informed Plaintiff of the claims litigated in the *Clements* case [*id.*, at p. 4], his right to opt-out of the *Clements* Settlement [*id.*, at pp. 7-8], the release of his claims if he chose not to opt-out [*id.*, at p. 7], and the actions he needed to take to opt-out [*id.*, at p. 8]. The deadline to opt-out of the *Clements* Settlement was April 28, 2014. [*Id.*, at p. 5]. Plaintiff did not opt-out or submit a request for exclusion from the class. [*Id.*, at p. 2]. On September 25, 2014, Plaintiff was mailed a settlement check for the amount of two thousand five-hundred

two dollars and sixty-four cents ($2,502.64), and the check was cashed. [*Id.*]. On June 10, 2015, Plaintiff was mailed a second check for the amount of one thousand two hundred and forty-eight dollars and seventy-seven cents ($1,248.77), and that check was also cashed [*Id.*].

Plaintiff acknowledges that while he *was* a class member when the notice of settlement was sent out, when the opt-out deadline expired and when he received the first check from the *Clements* settlement, he is *no longer* a class member because he has since received a full refund for the force placed insurance coverage. [ECF No. 117, pp. 14-15]. Plaintiff specifically references the *Clements* class definition, which includes "[a]ll persons in the United States who were charged by JPMorgan for lender-placed flood insurance (*unless such charge was flat cancelled/refunded in full*)[.]" [ECF No. 94-2, ¶ 5] (emphasis supplied).

According to Plaintiff, this means that even though he received the *benefits* of the class action settlement (two checks totaling $3,751.41), he is now excused from holding up his end of the bargain (i.e., not filing a lawsuit based upon excess force placed insurance coverage and allegations of kickbacks) due to a refund he received after the fact. Plaintiff provides no legal support to support this contention.

At the time the district court in *Clements* entered the final order of judgment (June 6, 2014), Plaintiff was indisputably a class member who had declined to opt out. Afterwards, Plaintiff accepted $3,751.41 from Chase as a result of the settlement,

including $1,248.77 after this case was already filed. To allow Plaintiff to unilaterally secede from the settlement class without any action by the court that actually established the class and imposed the bar on Settlement Class Members from pursuing "all claims actually made or that could have been made on behalf of Settlement Class Members" would be inequitable and would impose upon the *Clements'* court's jurisdiction. Furthermore, Plaintiff presents no legal authority to support this retroactive, unilateral de-classification.

Accordingly, the Undersigned finds that because Plaintiff did not timely opt out of the *Clements* class and then proceeded to accept the benefits of class membership, he is, in fact, a *Clements* Settlement Class Member and therefore has, in accordance with the Settlement Agreement, released "all claims actually made or that could have been made on behalf of Settlement Class Members based on the facts asserted in the Consolidated Amended Complaint through the date this Settlement Agreement is executed." [ECF No. 94-1, at ¶ 2(aa)].

But this does not mean that Plaintiff's claims in this case are barred in their entirety. More on this below.

2.      <u>*Clements* does not bar Plaintiff's claims (for the most part).</u>

The release in *Clements* is drafted broadly ("all claims actually made or that could have been made"), however, it is rooted in the "*facts* asserted in the Consolidated Amended Complaint[.]." [ECF No. 94-1, at ¶ 2(aa)] (emphasis supplied). "*Res judicata*

26

applies not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact." *Manning v. City of Auburn*, 953 F.3d 1355, 1358-59 (11th Cir. 1992) (internal quotations omitted). To make a determination concerning claim preclusion, "[a] court '***must look to the factual issues to be resolved*** [in the second cause of action], and compare them with the issues explored in' the first cause of action." *Id.* at 1359 (quoting *S.E.L. Maduro v. M/V Antonio De Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987)) (emphasis supplied). Accordingly, based upon the wording of the Release itself and the Eleventh Circuit precedent, the Undersigned must assess whether Plaintiff's claims for tortious interference with a business relationship and violation of a fiduciary duty are rooted in the same facts upon which the *Clements* Consolidated Amended Complaint is based upon. From my perspective, there is a significant difference.

In *In re Prudential Insurance America Sales Practice Litigation*, 148 F.3d 283, 311 (3d Cir. 1998),[5] the Third Circuit found that "[t]he named plaintiffs . . . all have claims arising from the fraudulent scheme perpetrated by Prudential. That ***overarching scheme is the linchpin*** of [the complaint], regardless of whether each class member alleges a churning claim, a vanishing claim, an investment plan claim, or some other injury[.]" (emphasis supplied).

---

[5]      Cited by *Adams*, 493 F.3d at 1290.

27

The Consolidated Amended Complaint in *Clements* also features an "overarching scheme" that is the "linchpin" of each named-plaintiff's grievances: a scheme by Chase to impose *excess* flood insurance coverage on properties and to receive "kickbacks" in the carrying out of this scheme. *See Clements v. JP Morgan Chase Bank, N.A.*, Case No. 12-cv-02179, ECF No. 45 (Consolidated Amended Complaint) (N.D. Cal. Aug. 5, 2013) (hereafter cited as "CAC"). The factual scenarios presented by each named plaintiff in *Clements* differ significantly from the basic claim presented here by Plaintiff. Specifically, none of the three named plaintiffs in *Clements* alleged that Chase imposed flood insurance on their property **even though they already had coverage.**

First, Plaintiff Clements did not have flood insurance on her property when Chase force placed coverage on February 3, 2011. [CAC, pp. 9-11]. The nature of Clements' claim was threefold: (1) that Chase, as the servicer and not originator of the loan, was not authorized to require coverage for her property; (2) that Chase imposed excess coverage on the property, imposing a policy for $250,000 when the replacement value was only $125,000; and (3) that Chase received "kickbacks" in the form of commissions and reinsurance premium payments as a result of force placing the excessive and unnecessary coverage on Clements' property. [*Id.*, at pp. 9-12]. All of these causes of action relate to a scheme to impose *excessive* flood insurance on Clements' property, *not* impose coverage on already-insured property. This is a

sufficient factual distinction -- and demonstrates that these claims did *not* arise from the same operative nucleus of fact.

While it could be argued that Clements' first claim is *reminiscent* of Plaintiff's assertion that flood insurance was forced on his property when it should not have been, the factual scenarios in both cases offer stark contrasts. For instance, unlike Clements, Plaintiff's claims do not contest Chase's *right* to actually impose coverage on his property. Plaintiff does not contend that flood insurance for his property is "*unnecessary*" in general, but rather that, in his particular case, flood insurance is already provided by his homeowner's association. Additionally, Clements, unlike Plaintiff, did not actually have flood insurance coverage in place already when Chase imposed coverage. For these reasons, I find that Plaintiff's specific claims could not have been resolved through the *Clements* action because the facts presented for Plaintiff Clements were different.

The second named plaintiff, Matthew Scheetz, like Plaintiff, had flood insurance on his property before the forced placement of insurance by Chase. [CAC, pp. 12-15]. However, the source of Scheetz's claim was that Chase required him to obtain *excess* insurance coverage. Specifically, Chase required Scheetz to obtain flood insurance coverage for the full replacement value of his property, when, in fact, it should have required only enough coverage to protect the lender -- an amount more than $50,000 less than Chase required to be placed on the property. [*Id.*]. Accordingly, Chase

imposed coverage for that excess amount on Scheetz's property, which is the basis of Scheetz's claim. Again, as with Clements, Plaintiff's claim does not relate to the imposition of excess flood insurance coverage, which means that his specific claim *could not* have been resolved under the facts alleged in the earlier class action.

The Piterniaks are the third set of named plaintiffs in *Clements*. Their claims too do not include the imposition of flood insurance on already-insured property. The Piterniaks' claims were that Chase imposed back-dated, excessively-priced flood insurance on their property without notice and after the time to make claims had already expired, and that Chase required them to maintain flood insurance in an amount over and above the lender's requirement. [CAC, pp. 15-17]. Unlike Plaintiff, the Piterniaks did not have flood insurance on their property when Chase force placed coverage. [*Id.*, at p. 15]. No portion of the Piterniaks' claim relates to the imposition of flood insurance generally on already-insured property. Thus, under this factual scenario too, the *Clements* court would have been unable to resolve Plaintiff's base claims concerning the imposition of coverage when sufficient coverage was already in place.

The final result of the *Clements* case was a settlement that addressed only the *excesses* of the flood insurance coverage scheme, not the base imposition of flood insurance in the first place (or, more specifically, not a scheme to impose *any* flood insurance on properties that are already insured). None of the named plaintiffs in

*Clements* presented factual scenarios that matched those of Plaintiff (i.e., the force placement of insurance on already-insured property) and thus none of the plaintiffs *could have* brought the precise claims Plaintiff brings here. "The class-action device was intended to establish a procedure for the adjudication of common questions of law or fact. If [Chase's legal position] were adopted, it would be tantamount to requiring that every member of the class be permitted to intervene to litigate the merits of his individual claim." *Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 880 (1984).

For Plaintiff's specific claims -- relating to the unnecessary forced placement of insurance on his property -- to have been resolved in *Clements*, he would be required to do just that: intervene and litigate his specific claims in that action. Rule 23 does not impose that requirement upon class members. Therefore, Plaintiff's claims for tortious interference with a business relationship and violation of a fiduciary duty are not barred *in their entirety* by *Clements*.

However, *portions* of those claims, as phrased in the Third Amended Complaint [ECF No. 84], are barred. Specifically, as to Count II, tortious interference with a business relationship, Plaintiff's allegations in paragraphs 65, 66, 67 and 71 are barred by *Clements*. Those paragraphs relate to the issues of inflated premiums, excess coverage and kickbacks. [*Id.*, at pp. 18-19]. Those specific issues **were** resolved in *Clements* and Plaintiff already received compensation -- two checks totaling $3,751.41. [ECF No. 103-1, p. 2]. As to Count III, violation of a fiduciary duty, Plaintiff's allegations

in paragraphs 75, 78, 79, and 80 concerning inflated premiums and kickbacks are barred by *Clements*. [ECF No. 84, pp. 19-21].

As to both of these counts, Plaintiff may address only the fact that insurance was generally force-placed on his property when insurance coverage already existed. Any issues concerning inflated premiums and kickbacks were released by Plaintiff when he declined to opt out of the *Clements* Settlement Class and accepted compensation for his claims there. Therefore, on this ground alone, Chase's motion for summary judgment is **granted in small part**.

Practically speaking, this means that Plaintiff's case-in-chief at trial will thus be limited solely to the imposition of coverage generally -- he will not be permitted to present irrelevant evidence concerning *excessively-priced* coverage or kickbacks (or any derivatives thereof). It is uncontested that Plaintiff was compensated concerning those issues already.

## IV.   CONCLUSION

It is hereby **ORDERED** that Chase's Motion for Summary Judgment [ECF No. 106] is **denied in large part** and **granted in small part**.

**DONE and ORDERED** in Chambers, in Miami, Florida, July 22, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

32

<u>Copies furnished to</u>:
All Counsel of Record